PRENTISS, Appellant, vs. STRAND and others, Respondents.

*February 3—February 24, 1903.*

*Bills and notes:* Bona fide *purchasers: Fraud: Evidence: Practice: Negligence.*

1. Where plaintiff's assignor purchased a negotiable promissory note in good faith, and for value, before maturity, plaintiff is entitled to the rights of a *bona fide* purchaser for value before maturity, although he may have had notice of defects.
2. The owner of a stallion proposing to sell him for $2,000 to a contemplated corporation, procured signatures to contracts binding the signers to take stock in the corporation, and, on organization, to give three notes for the purchase price. After all such agreements had been carried out it was discovered that the signers had signed another note for the full amount, printed on the same paper as the contracts. This note had been assigned to V., a *bona fide* purchaser for value, and by V. assigned to plaintiff for value, both transactions having taken place before maturity. *Held*, that evidence that the signers of the note on which action was brought had paid the other notes was admissible as part of the same negotiation, and as showing extinguishment of their liability arising therefrom.
3. Where the answer to a question is objected to, but no motion is made to strike it out as nonresponsive to the question, it is not error to allow the answer to stand.
4. In an action against several signers of a promissory note alleged to have been procured to be signed by fraud, there was

testimony tending to show that the note in question had been torn from a book which purported to contain a contract to take stock in a corporation organized to purchase a horse, that the book was so bound that the part containing the note was invisible, and that the description of the book as given by all the signers was substantially identical. *Held*, that it was not error for the court, in framing questions for a special verdict, to assume that the note was in the same condition when all the defendants signed it.

5. In such case, evidence of a witness that he signed a note, contained in the same book, about the same time, and that the entire note was visible, corroborated to some extent by plaintiff's attorneys, is *held* to be insufficient to overcome a verdict that the signers were not guilty of negligence in not more closely examining the paper, and discovering that they were signing a note.

APPEAL from a judgment of the circuit court for Trempealeau county: JAMES O'NEILL, Judge. *Affirmed.*

This is an action upon a promissory note purporting to be signed by twenty-three persons, in the following terms:

"Arcadia, Wis., April 2, 1892.

"For value received, we, or either of us, promise to pay to Byron S. Fryer, or order, two thousand dollars, as follows: $600.00 April 1st, 1893, $700.00 April 1st, 1894, $700.00 April 1st, 1895, with interest at the rate of eight per cent. per annum; interest payable annually; interest, if not paid when due, to be added to the principal, and bear' interest at the same rate."

The plaintiff claimed to be a *bona fide* purchaser of this note before maturity. All of the alleged signers of the note were made defendants in the action, but two of them were not found, and were never served upon; hence there were twenty-one real defendants. Of these, two, *Knut L. Strand* and *Vrol Swenson,* answered, denying the genuineness of their signatures to the instrument. The remaining nineteen defendants answered separately, each denying that he ever signed the alleged note, and further alleged that, if his apparent signature thereto be not a forgery, then that such signature was obtained by a fraudulent substitution of one

paper for another by Fryer, or by some other fraudulent de-
vice, by means of which he signed what seemed and what was
represented to be a contract for the purchase of a stallion,
when in fact the writing contained a note. The action was
tried before a jury. On the part of the plaintiff the note in
question was offered and received in evidence. It was in-
dorsed in blank by Byron S. Fryer. One Valerius testified
that he purchased it in good faith from Fryer August 12,
1892, and sold it to the plaintiff February 7, 1894. The
plaintiff testified that he purchased the same from Valerius
in good faith, and for value, February 7, 1894. The plaintiff
also offered in evidence the testimony of experts tending to
show the genuineness of the signatures of the various defend-
ants. The note was partly printed and partly written, and
occupied a few lines in small print at the top of the paper;
the paper itself being oblong in shape, about seven inches
long and four inches wide, with a line of perforations at the
top, where it appeared to have been severed from something
else. It apparently had been a leaf of a book arranged to
open at the end, the printed part constituting about one-third
of the space at the top, and the other two-thirds of the page
being arranged with lines for signatures in double columns,
there being twenty-four places for signatures, and all but one
of the spaces being filled with the alleged signatures of the
defendants. At the close of the plaintiff's evidence the ac-
tion was dismissed as to the defendants *Vrol Swenson* and
*J. O. Nilsestuen,* whose signatures were each evidenced by a
mark, because there was no proof that either of them au-
thorized his mark to be made. The action was also dis-
missed as to the defendant *K. L. Strand,* because it appeared
that his name was signed by his son, and there was no proof
of his son's authority. All of the remaining eighteen defend-
ants testified as witnesses on their own behalf. They are and
were farmers living in the vicinity of Arcadia, and all are
foreigners; a number not being able to read English. All of

them finally conceded the genuineness of their signatures, except *Lena Christenson,* who absolutely denied signing. Their testimony substantially agreed as to the general nature of the circumstances under which their signatures were obtained. Their testimony tended to show that in March, 1892, Byron S. Fryer, accompanied by one Bilben, a Norwegian interpreter, came to Arcadia with a stallion, which he proposed to sell for $2,000 to a company of farmers, his plan being to form a company, who should take twenty shares of $100 each. To accomplish this purpose, Fryer and Bilben went around the country, and called on the defendants individually, to get them to subscribe to shares in the proposed company; and then in each case, when consent was finally obtained, a book was produced by Fryer, which corresponded in size with the paper on which the note in suit appears, which book was represented by Fryer as containing a contract by which the signers agreed to form a company for the purchase of the horse and to give notes for $2,000 after the company was formed. Those of the defendants who could read testified to having read the supposed contract, which was described as commencing at the top of the page and reading down continuously, the last four or five lines being upon the lower page; and said lines being that part of the note beginning "two thousand dollars, as follows." Most of the defendants testified that no such words as the first part of the note, to wit: "Arcadia, Wis., April 2, 1892. For value received, we, or either of us, promise to pay Byron S. Fryer, or order," were visible. Several of the defendants, who examined the book most closely, testified that the binding was very stiff, and was an inch or more in width, so that it could not be opened clear back. Nearly or quite all of the defendants who did not examine the book so closely testified in general terms that the book had the condition and appearance testified to by the witnesses who described it particularly. The defendants who could not read stated that Fryer or Bilben pre-

tended to read it to them, and induced them to believe by such reading that it was simply a contract to form a company to buy the horse, and to take shares in such company, and give notes for the horse when the company was formed, and, in all but one or two instances, that no one was present or within reach at the time who could read the English language. All of the defendants unite in declaring that the understanding was that, after the shares were subscribed, a meeting of the subscribers was to be held to close the business, and give the notes; and it appears that this meeting was in fact held April 2, 1892, and three notes in the usual form of promissory notes, one for $600 and two for $700 each, were then given, signed by the defendants; all of which have been paid in full. Neither Fryer nor Bilben was called as a witness, so that the defendants' statements as to the transactions with Fryer stand without any direct contradiction. Upon rebuttal, however, one Pelowski testified to signing a note about the same time, contained in the same book, and his testimony tends to show that when he signed the entire note was visible. This testimony is also corroborated in some degree by the testimony of one of the plaintiff's attorneys, who claims to have seen the book at several times while Fryer was obtaining signatures to the note.

The following special verdict was rendered by the jury:

"1. Is the signature of *Lena Christianson* on Exhibit A the genuine signature of such defendant? *Answer.* No. 2. Did the plaintiff purchase the note February 7, 1894, for value, and in good faith? *A.* No. 3. Did Valerius purchase the note for value, before maturity, and in good faith? Not answered. 4. Were the first three lines of the paper Exhibit A concealed by the binding in the book when it was subscribed by defendants, so that a person reading the upper and lower pages of said book, and using ordinary care, would read the same as a continuous writing and contract, and without observing said first three lines of said Exhibit A? *A.* Yes. 5. Were the signatures to the note Exhibit A of such

of the. defendants as could not read the English language obtained by the fraudulent representation that the paper they were signing was a contract for the purchase of a stallion, with provisions as to forming a company, price, pedigree, number and price of shares, notes to be given, date of payments, and rate of interest, and by fraudulently omitting to read or inform the defendants of the first three lines of said Exhibit A?  *A.* Yes.  6. Were the defendants induced by fraudulent representations, trick, or artifice to execute the paper Exhibit A, and under such circumstances that they were fraudulently led to believe that they were signing only a contract for the purchase of a horse, without any promissory note therein?  *A.* Yes.  7. Did the defendants, when they executed Exhibit A, believe that it was a contract for the purchase of a stallion and the forming of a company therefor, and not a promissory note?  *A.* Yes.  Were the defendants in the exercise of ordinary care in affixing their signatures to the paper Exhibit A without discovering that it was in form a promissory note?  *A.* Yes."

Upon this verdict judgment was rendered for the defendants, and the plaintiff appeals.

For the appellant there was a brief by *Richmond & Richmond* and *Higbee & Bunge,* and oral argument by *E. C. Higbee.*

For the respondents there was a brief by *Gaveney & Comstock* and *S. G. Gilman,* and oral argument by *J. C. Gaveney.*

WINSLOW, J.  The evidence leaves no doubt of the grossly fraudulent character of the operations of Fryer.  By means thereof he succeeded in obtaining from the defendants apparent obligations aggregating $4,000 for the purchase of property not exceeding $2,000 in value.  Indeed, the fraud is not controverted in this case, and the only questions really in dispute were whether the plaintiff was entitled to protection as a *bona fide* holder of commercial paper, and, if so, whether the defendants were guilty of negligence in signing that which was in reality a negotiable note, but which they sup-

posed to be simply a contract to purchase a horse, and give their notes therefor. The first question suggested really drops out of the case upon this appeal for two reasons: (1) Because the *bona fides* of both Valerius and the plaintiff in purchasing the note in suit was thoroughly proven without substantial contradiction, and (2) because the jury failed to negative the good faith of Valerius in his purchase. If Valerius purchased in good faith, and for value, before maturity, then the plaintiff, who purchased from him, is equally protected even though he may have had notice himself of defects. *Montpelier S. B. & T. Co. v. School District,* 115 Wis. 622, 92 N. W. 439. We proceed, therefore, to consider whether the verdict of the jury to the effect that the defendants exercised ordinary care in affixing their signatures to the paper was arrived at without prejudicial error. The first and most important contention made by the appellant is that there was error in the admission of evidence. This claim is based upon the admissions of the testimony of the defendants to the effect that they had subsequently paid the three notes which they admittedly signed for the purchase of the horse. This is said to be proof of another transaction, having no legal bearing upon the controversy, and naturally exceedingly prejudicial to the plaintiff. With this claim we cannot agree. The defense of the defendants was that the various transactions by which they were induced to sign the various papers were all integral parts of the same negotiation; that in the course of this one negotiation they agreed to form a company to buy the horse for $2,000, and to give their notes for the price; and that the various papers which they signed were intended to accomplish these agreements, and nothing more. Clearly, it was necessary for them to show all that was done at the time, and we can see no valid reason why it was not competent for them to show payment of the notes. This was, in effect, simply showing that they had fully performed and discharged the agreement in fact made. Had they not shown

that they gave and fully paid the note, the case would have stood simply upon the admitted fact that they bought the horse, agreed to pay $2,000 therefor, that they had not paid it, and that the plaintiff was the owner of their agreement to pay in notes, with all the rights at least of an assignee of the contract. The payment and discharge of the notes, thus extinguishing all liability to any one resulting from the transaction (provided they showed themselves free from negligence), was manifestly proper, if not necessary, to make their defense complete. The facts were fully pleaded, and seem to us to be entirely relevant and proper to complete the history of the transaction, upon a distorted part of which plaintiff founds his right.

The appellant also claims error in the admission of evidence of the defendants to the effect that they laid the matter before the district attorney of the county, and that Fryer finally admitted the fraud, and sent a man to settle with the defendants. The supposed erroneous evidence came into the case in the following manner: Upon cross-examination of *L. K. Strand,* the plaintiff proved by him that he signed a receipt acknowledging payment to him by Fryer July 6, 1892, of $102.50, with the statement that it was for services in assisting in the sale of the horse. This receipt was then put in evidence by the plaintiff. Upon re-examination the defendant's counsel asked *Mr. Strand* to state the circumstances under which he signed the receipt, and he answered, against objection for incompetency, that "it was an indorsement that this man [Fryer] had beat us out of. I think it was a little over $1,000. We were down to Galesville to the district attorney, and had him attend to it, and he wrote to him if he would not come back and pay that money." This answer was objected to, and the court said that it was not an answer to the question, but no motion was made to strike it out. It is always competent to explain a mere receipt for money, so that there appears to be no serious ground of objection to the

question asked.  If the answer was not responsive, the plaintiff should have moved to strike it out.  Probably the court would have done so had the motion been made.  In the absence of such a motion, no error appears.

It is claimed that there was error resulting from the fact that question 4 and the following questions of the special verdict to the jury assume that the supposed note was in the same condition when all the defendants signed it, whereas in fact they all signed at different times and places, and they do not all testify that part of it was concealed in the binding of the book.  In this connection it is said that the defendant *Martin Waldera,* who could not read, did not have the contract read to him by Fryer, nor even ask that it be read.  The objection does not seem substantial.  All of the defendants who can read English testify, in substance, that they took the book, and read the supposed contract, or looked over while Fryer was reading it; and they all testify to the condition of the book—as to the stiffness of the binding, and the fact that an inch of the leaf was thereby concealed, and that no perforation was visible.  Some of them testify to this particularly, and some generally, by stating that its condition and appearance was identical with the description given by the defendant *Moen,* who testified positively and clearly to the fact.  Most of the witnesses who could not read testify also to the appearance of the book being the same as described by *Moen,* and they all testify (including *Waldera*) in one form or another to the effect that there was no one present or accessible who could read English, and that Fryer read or explained its contents to them either upon request or without request, and that his explanation and reading was that it was a contract to form a company and purchase the horse, and that they believed him.  As matter of fact, the form of the questions does not prevent the jury from excepting from an affirmative answer the three defendants whom appellant claims might have been found careless in signing.  But, even

if the fact were otherwise, careful reading of the testimony convinces us that the proof was simply overwhelming that the book was in the same condition when all of the defendants signed, and that the attempted evidence in rebuttal is insufficient to shake this conclusion in the least, or authorize the jury to find any verdict to the contrary.

These considerations also dispose of the claim that the verdict is contrary to the evidence. On the whole case we are satisfied that justice has been done without material error.

*By the Court.*—Judgment affirmed.